1
2
3
4
5
6
7
8  **UNITED STATES DISTRICT COURT**
9  **CENTRAL DISTRICT OF CALIFORNIA**
10
11
12  THOMAS ANTHONY PEREZ, an
13  individual,
14              Plaintiff,
15          v.
16  CITY OF FONTANA, a public entity;
17  DAVID JANUSZ, JEREMY HALE,
18  RONALD KOVAL, ROBERT MILLER,
19  and JOANNA PIÑA, individually and in
20  their official capacities; and Does 1–10,
21  inclusive,
22              Defendants.
23
24
25
26
27
28

Case No. CV 19-1623-DMG (KKx)

**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [67]**

-1-

Before the Court is a Motion for Summary Judgment ("MSJ") filed by Defendants David Janusz, Jeremy Hale, Ronald Koval, Robert Miller, and Joanna Piña.  [Doc. # 67.]  The MSJ is fully briefed.  [Doc. ## 74 ("Opp."), 89 ("Reply").]  For the following reasons, the Court **GRANTS in part and DENIES in part** the MSJ.

# I.
## PROCEDURAL BACKGROUND

Plaintiff Thomas Anthony Perez Jr. filed the instant action on August 23, 2019, asserting claims again Defendants City of Fontana, David Janusz, Jeremy Hale, Ronald Koval, Robert Miller, and Joanna Piña.  [Doc. # 1.]

In the operative Second Amended Complaint ("SAC") [Doc. # 30], Perez asserts claims for:  (1) unreasonable search and seizure of his person under 42 U.S.C. section 1983; (2) excessive force under Section 1983; (3) unreasonable search of his property under Section 1983; (4) substantive due process violation under Section 1983; (5) unreasonable seizure of his property under Section 1983; (6) retaliation for protected speech under Section 1983; (7) violation of the Bane Act, Cal. Civ. Code section 52.1; and the state law torts of (8) false arrest/imprisonment; (9) battery; and (10) intentional infliction of emotional distress ("IIED").

On September 10, 2021, the Court dismissed the City of Fontana from this action with prejudice, and dismissed Perez's section 1983 claim for excessive force against Koval and Miller.  [Doc. # 39.]  All other claims against Defendants remain.  *Id.*  In the instant MSJ, Defendants seek summary judgment on Perez's remaining claims in their entirety. MSJ at 2–4.[1]  The Court held a hearing on the MSJ on June 9, 2023.

//

//

---

[1] All page citations herein refer to the page numbers inserted by the CM/ECF system.  Video and audio exhibits lodged with the Court are cited by timestamp.

-2-

## II.
## FACTUAL BACKGROUND

The facts in this section are uncontroverted, unless otherwise stated. Many of the parties' purportedly disputed facts are not in fact controverted by the evidence, and the Court therefore cites to them as uncontroverted facts. Facts are drawn from Defendants' Statement of Undisputed Facts ("SUF") [Doc. # 67-1], as set forth with Perez's responses in his Opposition. [Doc. # 78.] The Court has reviewed the entire record, but only discusses the uncontroverted material facts that are necessary to or affect its analysis.

### A.   Facts of Case

The Court presents its best understanding of the facts as they occurred chronologically, based on its review of the evidence.

At relevant times, Perez lived in Fontana, California, in a house he shared with his father, Thomas Perez Sr. ("Perez Sr."). SUF 1. According to Perez, at around 9:30 or 10:00 p.m. on August 7, 2018, Perez Sr. left the house with their dog, Margosha, to get the mail. SUF 3; *see also* Decl. of Joanna Piña ISO Defs.' MSJ ¶¶ 5, 13 [Doc. # 67-5 ("Piña Decl.")]; Decl. of Thomas Perez Jr. ISO Pl.'s Opp. ¶ 2 [Doc. # 71 ("Perez Decl.")]. Margosha returned to the house a few minutes later, but Perez Sr. never did. Piña Decl. ¶¶ 5, 13; Perez Decl. ¶ 5. After he went missing, Perez was very worried about his father's wellbeing because Perez Sr. is elderly, with limited physical and mental capabilities and English skills. Perez Decl. ¶ 9. It turned out that Perez's father was safe and unharmed, but Perez did not know this at the time. SUF 37.

The following afternoon, on August 8, Perez called the Fontana Police Department ("FPD") to report that his father was missing. SUF 1. Eventually, he spoke to Community Service Officer Piña on the phone and made a missing persons report. SUF 3.[2] After speaking to Perez, Piña told her supervisor that Perez's demeanor during that call raised

---

[2] An audio recording of the initial telephonic missing person report taken by Piña was lodged with the Court as Exhibit T to Defendants' MSJ.

her suspicions, because he seemed distracted and unconcerned with his father's disappearance. SUF 4, 5. Piña and her supervisor, Corporal Sheila Foley, decided to do the missing person investigation in person, and went to Perez's house together. SUF 5. It appears, from footage captured by Piña's body-worn camera ("BWC"), that Foley entered the house first and Piña entered through an open front door soon thereafter. SUF 6; MSJ, Ex. U (Piña BWC footage) at 00:05–00:15 [Doc. # 67-2]. Upon Piña's entry, Foley introduced her to Perez as "the officer you spoke to on the phone" and Perez, standing on the other side of the room, greeted her with a quick "hello" before turning his attention back to his conversation with Foley. MSJ, Ex. U at 00:05–00:15.[3] Other Fontana Police personnel, including lead Detective Miller, also reported to the scene. SUF 7, 10. Video footage shows that Miller also entered through the open front door, and Perez greeted him without protest. MSJ, Ex. AA (Miller BWC footage) at 00:01–15.

Eventually, Perez voluntarily agreed to go to the FPD station to speak to investigators about his father's disappearance and gave consent for officers to continue searching his residence in his absence. MSJ, Ex. DD (Miller BWC footage) at 1:29–2:25 (Perez giving oral consent); *see also* Perez Depo. Tr. at 95 (Q: So you voluntarily agreed to go to the Fontana stationhouse to give a statement? A: Yes.").

So began Perez's nearly day-long stay at the FPD station and/or with FPD officers. His first few hours were spent with Miller (and sometimes Hale) in an interview room, discussing "basic facts" about the timeline of his father's disappearance. SUF 15. In his deposition, Perez referred to a "first interrogation" that lasted approximately an hour and a half. MSJ, Ex. D (Perez Depo. Tr.) at 97–98. Perez testified that he was treated "fairly" by FPD officers during this "first interrogation." Perez Depo. Tr. at 98.

---

[3] At different points in his deposition, Perez provided contradicting accounts of his initial encounter with Piña. First, he states that he does not believe she did anything wrong during the incident, but then he implies that she improperly entered and searched his residence. *See* MSJ, Ex. E (Perez Depo. Tr.) at 115–16, 118–19.

1   While Miller was with Perez, Hale applied for and received search warrants of
2   Perez's property, any persons located at his residence, his two trucks, and three cellphones
3   at the residence. SUF 17; *see also* MSJ, Ex. G ("Aug. 8, 2018 Warrant") at 136–47.
4   Pursuant to the search warrant, FPD officers reported back to Perez's house around 8:35
5   p.m. that evening. *See* Hands Decl., Ex. 8 (Aimee Gregory Incident Report) at 8. During
6   their search, FPD field technicians found some visible bloodstains, and used a substance
7   called "Blue Star Forensic," a latent bloodstain detection reagent, which detected latent
8   bloodstains in various locations throughout the house. SUF 18; Miller Decl. ¶ 18; Hands
9   Decl., Ex. 13 (photographs of blood evidence taken by FPD personnel in Perez's residence)
10  at 2–19 [Doc. # 75-13]. The K-9 unit brought dogs to assist with the search, who alerted
11  to "the presence of deceased human remain odor in Perez's father's upstairs bedroom."
12  SUF 19.

13  The record does not reflect when the nature of the questioning changed tone after
14  the search, although Perez began what he called a "second interrogation," around 10:00
15  p.m. that evening. Perez Depo. Tr. at 99, 102. Miller testified that he was with Perez (and
16  sometimes Hale) for approximately 7–8 hours in that initial interview, so the "second
17  interrogation" was likely with him as well. *See* MSJ, Ex. J ("Miller Incident Report") at
18  180 [Doc. # 67-2]. Around this time, Miller determined that there was "sufficient" cause
19  to believe that a serious crime had taken place involving Perez, and decided to continue the
20  investigation and further interview him at the FPD station. SUF 21; Miller Decl. ¶ 21;
21  Miller Depo. Tr. at 9. At around 2:57 a.m. on August 9, Miller and Hale prepared and
22  obtained a second search warrant, supported by a probable cause affidavit from Hale.
23  Miller Decl. ¶ 8; Hale Decl. ¶ 8. The second search warrant sought authority to search
24  account subscriber information and call detail records for the two phones seized pursuant
25  to the August 8 Warrant. SUF 48; MSJ, Ex. H ("Aug. 9 Warrant") at 149–63 [Doc. # 67-
26  2].

27  At some point in the morning on August 9, Janusz and another officer, Kyle Guthrie,
28  began interviewing Perez. SUF 24; Miller Decl. ¶ 21. They drove Perez around to various

-5-

places, purportedly to investigate his father's disappearance.  SUF 23; *see also* MSJ, Ex. R (Janusz Incident Report) at 224–25.[4]  While in the car with Janusz and Guthrie, Perez was seated in the front seat, and was not restrained in any way.  The video evidence shows that at various points during this ride, Janusz and Guthrie verbally berated Perez, including insisting that he did not need his medication, and that they know he killed his father.  *See, e.g.*, MSJ, Ex. ZZ (Guthrie BWC footage) at 00:07–43 (Guthrie:  "Thomas didn't do anything.  That medication you're taking has caused you—Thomas—to have some issues.  Where can you take us to show us where Daddy is. . . . Thomas could never do anything like this . . . but that's not the issue.  The medication, it took over, and we need to find Daddy right now."), Ex. GGG (same) at 00:36–46 (Janusz:  "We're not going to go to the hospital, because that's not going to help you.  Guthrie:  "That's the easy way out."  Perez:  "But… I need, I needed attention."  Janusz:  "No you don't.").

The record does not reflect when Janusz, Guthrie, and Perez returned to the station, but there is an eight-and-a-half-hour video depicting the events beginning at 2:32 p.m. on that day.  *See generally* MSJ, Ex. FF ("Interrogation Room Video"); *see also* Hands Decl., Exs. 17 (Defendants' transcript of Interrogation Room Video), 18 (Perez's transcript of Interrogation Room Video).  Janusz's Incident Report stated that they returned to the station because "[i]t seemed as if [Perez] wanted to talk more" after their ride.  MSJ, Ex. R at 225.

The video shows that Perez was questioned on and off by Hale and Janusz, and also spent time alone with his friend Carl Peraza, who was summoned to the station on his request.  SUF 31.  Over the course of his time at the station, Perez became very distressed and gave a false confession that he had killed his father.  SUF 33.  Soon thereafter, while alone in the interrogation room, Perez removed his shoelaces from his shoes and attempted

---

[4] Janusz's incident report reflects an erroneous incident date of August 7, 2018, but the narrative clarifies that the incident occurred on August 9, 2018.

to use them as a makeshift noose to hang himself.  SUF 34; Interrogation Room Video at 5:59:51–6:02:40.

After this incident, Perez was placed on a "5150" hold, named for California Welfare and Institutions Code section 5150, a provision allowing an adult experiencing a mental health crisis to be involuntarily detailed for a 72-hour psychiatric evaluation.  SUF 35; Hands Decl., Ex. 11 (Application for Assessment, Evaluation, and Crisis Intervention or Placement for Evaluation and Treatment under Section 5150 ("5150 Report")) at 2–4 [Doc. # 75-11].  Perez was transported to Arrowhead Regional Medical Center ("ARMC").  *Id.* At this time, he was placed in handcuffs for the first time and read his Miranda rights.  *Id.*; SUF 36.  That same night, Detective Miller received a phone call from Perez Sr.'s daughter, who informed him that Perez's father was alive.  SUF 37; Miller Decl. ¶¶ 25–28.

Miller obtained a third search warrant on August 13, after learning that Perez's father was unharmed, asserting that probable cause existed to investigate whether Perez had assaulted an unknown victim.  Hands Decl., Ex. 10 ("Aug. 13 Warrant") at 2–15 [Doc. # 75-10]; Hands Decl., Ex. 21 (Miller Depo. Tr.) at 9 [Doc. # 75-21].  The FPD never charged Perez with any crime, and he returned home after being released from his 5150 hold at ARMC.  Perez Decl. ¶¶ 83, 91–92.

**B.   Video Evidence**

In support of their MSJ briefing, the parties lodged over ten hours of unique video footage with this Court, the authenticity of which is undisputed.[5]  These exhibits include body-worn camera footage from Miller, Guthrie, and Pina, as well as an eight-and-a-half-hour video of Perez's questioning at the FPD station.  [Doc. ## 68, 80.]  These videos depict many material events in this case, shedding light on the conduct of all five

---

[5] In support of his Opposition, Perez submitted seven video exhibits and one audio exhibit which were entirely duplicative of the exhibits Defendants submitted with their initial MSJ, and even submitted one of his own video exhibits twice.  [Doc. # 80.]  Throughout this Order, the Court will cite to the relevant video and audio as they are marked in Defendants' exhibit list.

Defendants at various times.  The Court cites this video evidence extensively in its factual summary.

When confronted with a videotape of the events in question, the Court must "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).  And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the [video], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.  Indeed, for some of the interactions between Perez and the Defendants, the videos may obviate any genuine disputes of material fact as to what occurred in those interactions.  "In the absence of material factual disputes, the objective reasonableness of a police officer's conduct is 'a pure question of law.'"  *Lowry v. City of San Diego*, 858 F.3d 1248, 1254 (9th Cir. 2017) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)).  Where relevant to its discussion below, *see infra* Section IV, the Court will note where it credits its own review of the video evidence over the parties' other evidence and arguments.

## III.
## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Material facts are those that may affect the outcome of the case.  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go

beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial.").  "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  "Rather, it draws all inferences in the light most favorable to the nonmoving party."  *Id.*

**IV.**
**DISCUSSION**

**A.   Federal Claims**

Under 42 U.S.C. section 1983, a plaintiff may bring a civil action for the deprivation of constitutional rights by an individual acting under color of state law.  42 U.S.C. § 1983; *see Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014) ("Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights.") (citation omitted).  The two essential elements of a Section 1983 claim are that the defendant acted under color of law, and his conduct deprived the plaintiff of a constitutional right.  *Stein v. Ryan*, 662 F.3d 1114, 1118 (9th Cir. 2011).  Even when a constitutional violation has occurred, however, state officers are entitled to qualified immunity from a Section 1983 action unless the unlawfulness of their conduct was "clearly established" at the time.  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

It is undisputed that each Defendant acted under color of state law in all the events giving rise to this case, so the Court's analysis will solely address the existence of a constitutional violation, and, where applicable, whether qualified immunity applies.

1    **1.  Unlawful Seizure of Perez's Person (Claim 1)**

2         **a.  Seizure of Perez**

3         An individual is "seized" for the purpose of the Fourth Amendment when "the

4    officer, by means of physical force or show of authority, has in some way restrained the[ir]

5    liberty." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  It requires either "physical force,"

6    even if slight, or a "submission to the assertion of authority." *California v. Hodari D.*, 499

7    U.S. 621, 626 (1991) (emphasis deleted); *see also Torres v. Madrid*, 141 S. Ct. 989, 995–

8    97 (2021).  Perez brings a claim for unlawful seizure of his person against Janusz, Hale,

9    Koval, and Miller.  SAC ¶ 93.

10        The video evidence shows that Perez initially went to the FPD station voluntarily,

11   without any coercion or physical force.  *See* MSJ, Ex. DD (Miller BWC footage) at 1:29–

12   2:25 (Perez giving oral consent); *see also* Perez Depo. Tr. at 95 (Q:  So you voluntarily

13   agreed to go to the Fontana stationhouse to give a statement?  A:  Yes.").  Despite Perez's

14   post-hoc allegations to the contrary, *see* Opp. at 29; Perez Decl. ¶ 17, no reasonable juror

15   could possibly conclude otherwise after reviewing the video.  *See Scott*, 550 U.S. at 380–

16   81.

17        After that, neither side clearly identifies specific points at which Perez's time at the

18   FPD station might have become a seizure, let alone an unlawful one.  He was never

19   formally arrested, but a formal arrest is not required to be "seized" within the meaning of

20   Fourth Amendment.  *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

21   Defendants, quite implausibly, suggest that he was never "seized" until he was handcuffed

22   for transport to ARMC.  MSJ at 20.  Perez's Opposition also makes overly generalized

23   statements about his entire 17-hour stay at the FPD station, including that many "made it

24   abundantly clear that" Perez was not free to leave, that they refused him contact with a

25   lawyer and coerced him into a false confession.[6]  Opp. at 29–31.  In the alternative,

26   _____

27        [6] Perez's counsel, Jerry Steering, provides very little evidentiary or legal support for his arguments
28   in this section.  He cites only a single case on the nature of seizure, to support a general principle that an
     individual is seized when "a reasonable person would have believed that he was not free to leave" the

Defendants argue that any seizure of Perez was lawful because they had reasonable suspicion to detain him at the outset of his time at the station, and it was proper to detain him after the August 8 Warrant issued. *Id.* at 21–22.

What *is* clear, however, is that there are genuine disputes of material facts relevant to this claim.[7] Even if his initial encounter with the FPD was consensual, the Court "must consider whether these circumstances gradually escalated into a setting where a reasonable person standing in his shoes would not have felt free to leave. . . ." *United States v. Redlightning*, 624 F.3d 1090, 1103 (9th Cir. 2010); *see also I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) ("What has evolved from our cases is a determination that an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment . . . .").

Perez's own declaration states that he asked if he could leave, and was refused. Perez Decl. ¶¶ 31–48. There is deposition testimony in the record in which Miller said he could not recall if he told Perez he was free to leave during his session with Hale, and Janusz admits that he did not explicitly say that to Perez at any time. *See* Hands Decl., Ex. 21 (excerpts from certified deposition transcript of Miller ("Miller Depo. Tr.")) at 16 [Doc. # 75-21], Ex. 24 (excerpts from certified deposition transcript of Janusz ("Janusz Depo.

---

situation. *See* Opp. at 29–31 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Multiple times, he cites to the eight-and-a-half-hour Interrogation Room Video to support his general argument that a reasonable person would not have felt free to leave, without providing any pincites to assist the Court's review. *Id.* The Court is not obligated to "comb the record" to find evidence to support Perez's position. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001); *see also* Fed. R. Civ. P. 56(c)(3) ("district courts need consider only the cited materials").

[7] Perez's Opposition also states multiple times, again *without a citation to evidence*, that Perez asked for a lawyer during his questioning at the station and was refused. *See* Opp. at 18 ("Mr. Perez repeatedly expressed his desire to leave the interrogation and unequivocally requested to speak with a lawyer. Defendants refused to let Mr. Perez leave the interrogation."), 29–30 ("When Mr. Perez expressed his desire to speak with a lawyer, Defendants did not break the interrogation to allow Mr. Perez to consult with a lawyer."). The Court's review of the Interrogation Room Video and transcripts determines that at least in that part of the interrogation, he did not ask any FPD officer for a lawyer, although he does mention it to Peraza. *See* Interrogation Room Video at 47:32–40, 1:44:55–58.

Tr.")) at 22–24, 65; *see also* Reply at 18.  During much of the Interrogation Room Video, Janusz and Guthrie restrict his access to the door.  *Cf.* Redlighting, 624 F.3d at 1105; *see, e.g.*, Interrogation Room Video at 2:19:00–5:52:02.  It seems clear from the record that, at minimum, neither Miller, Hale, nor Janusz made it clear to Perez that he was free to leave and that the circumstances suggested to Perez that he was not free to leave.

Courts have also found that seizure occurs when police officers "use[d] heavy-handed tactics to confuse, disorientate, or intimidate" an individual.  *Redlightning*, 624 F.3d at 1105; *see also United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987).  Here, viewing the evidence in the light most favorable to Perez, a reasonable juror could conclude that these officers used such tactics.  Janusz (and Guthrie, a non-party) suggested that Perez's beloved dog would be euthanized if he did not confess, and brought his long-time friend to the station to help elicit a confession based on threats of prosecution.  *See* SUF 31; Interrogation Room Video at 1:01:35–40 (Peraza telling Perez that "they say they have enough evidence" to charge him with murder), 3:32:47–33:36 (telling story about dog who needed to be put down due to depression after it witnessed its owner murder someone).  They repeatedly insisted that he killed his dad.  *See, e.g., id.* at 3:30:38–31:02 ("It did happen.  It did happen.  You killed him and he's dead.  It's tough.  It is rough.").  And their tactics indisputably led to Perez's subjective confusion and disorientation, to the point that he falsely confessed to killing his father, and tried to take his own life.  SUF 33, 34.

Throughout all these tactics and questioning, "[i]t cannot seriously be suggested" that "a reasonable person in [Perez's] situation would have thought he was sitting in the interview room as a matter of choice, free to change his mind and go home to bed."  *Kaupp v. Texas*, 538 U.S. 626, 632 (2003).  The Court concludes that there are genuine disputes of fact as to whether Janusz, Miller, and Hale unlawfully seized Perez in the events giving rise to this case.

-12-

### b. Reasonableness of Seizure

A seizure is reasonable when an officer has probable cause to believe the suspect had committed a crime "under the totality of the circumstances." *Dubner v. City and Cnty. of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001).[8]

Construing the evidence in favor of Perez, reasonable jurors could find there was no probable cause to detain him before the search pursuant to the first warrant was conducted. For example, Miller and Hale thought that the messy condition of Perez's house was suspicious, "as though a struggle had taken place inside the residence," but Perez provided the reasonable explanation that the mess was because he was in the middle of renovations. SUF 7; Perez Decl. ¶¶ 23–24; *see also* MSJ, Ex. AA (Miller BWC footage) at 2:50–3:07 (discussing Perez's renovation), Ex. CC (same) at 1:07–19 (explaining that the house was a "disaster" because he was working on eight renovation projects).

The officers also noticed "evidence of physical injuries" on Perez's person and found that to be suspicious, despite Perez's explanation that his scratches were also from the renovations.  Piña Decl. ¶ 10; Decl. of Robert Miller ISO Defs.' MSJ ¶ 8 [Doc. # 67-6]; *see also, e.g.*, MSJ, Ex. CC (Miller BWC footage) at 2:38–49 (Perez showing Miller his arm scratches), 3:10–4:10 (discussion of knee bruising and other injuries), 4:12–27 (Perez: "I know you need to do your job thorough to see if there's any, uh, like, uh, defensive wounds or offensive wounds and all of these different things.  I don't blame ya, I got it all. No problem.  But, I'm a contractor, and this is what this is all from."); Decl. of Brenton Hands ISO Pl.'s Opp. ("Hands Decl."), Ex. 14 (photographs of Perez's injuries after he was taken into custody on Aug. 9, 2018) at 2–15 [Doc. # 75-14].

---

[8] Defendants also cite the so-called "*Summers* Rule," named for *Michigan v. Summers*, which provides that the occupants of a premises may be detained while a search of the premises is conducted pursuant to a lawful warrant. MSJ at 22.  The *Summers* Rule, however, is "confine[d] . . . to those who are present when and where the search is being conducted," *Bailey v. United States*, 568 U.S. 186, 197 (2013), and is therefore inapplicable to this case.

But the search conducted pursuant to the August 8 Warrant found evidence of bloodstains, and a K9 unit alerted to the supposed presence of deceased human remains in the upstairs bedroom.  SUF 17–19.  In light of his father's disappearance, the facts stated in the probable cause affidavit, and the fruits of this search, the Court concludes that no reasonable juror could conclude that Defendants did not have "reasonably trustworthy information sufficient to lead a person of reasonable caution to believe [that] an offense has been or is being committed by the person being arrested."  *See White v. City of Laguna Beach*, 679 F. Supp. 2d 1143, 1158 (C.D. Cal. 2010) (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)).  The missing person investigation for Perez Sr. did not conclude until Miller found out that Perez Sr. was alive, after Perez had been transported to ARMC.  SUF 38.

Even so, neither Koval nor Janusz can be found liable under this claim.  There are no arguments or evidence in this section relating to Koval whatsoever, and Janusz did not have any interaction with Perez or the investigation until after the August 8 Warrant was executed, *see* Decl. of David Janusz ISO Defs.' MSJ ¶¶ 5, 7 [Doc. # 67-3].  Accordingly, the Court **GRANTS** summary judgment to Koval and Janusz on the unlawful seizure claim.

### c.  Qualified Immunity

Having determined there is a triable issue of fact as to at least the lawfulness of the first phase of Perez's detention, the Court now turns to whether Hale and Miller and are entitled to qualified immunity.

For the defense of qualified immunity to apply, Defendants' conduct must not have been "clearly established" as unlawful.  The party asserting the injury bears the burden of "showing that the rights allegedly violated were clearly established."  *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017), *cert. denied sub nom. Shafer v. Padilla*, 138 S. Ct. 2582 (2018).  Demonstrating that the unlawfulness of an officer's actions was "clearly established" requires a showing that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that

-14-

1    what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589; *Hardwick v. Cnty. of Orange*, 844

2    F.3d 1112, 1118 (9th Cir. 2017).

3        A clearly established right cannot merely be implied by precedent, and plaintiffs

4    may not defeat qualified immunity by describing violations of clearly established general

5    or abstract rights outside "an obvious case." *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017)

6    (quoting *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004)); *see also Rivas-Villegas v.*

7    *Cortesluna*, 142 S. Ct. 4, 8 (2021) (*per curiam*) (the principles established by a case should

8    not be "cast at a high level of generality"). Nonetheless, the standard does not "require a

9    case directly on point for a right to be clearly established," so long as "existing precedent"

10   places "the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S.

11   Ct. 1148, 1152 (2018) (*per curiam*).

12       If Perez's Opposition makes an argument regarding qualified immunity for Miller

13   and Hale's seizure of Perez, this Court cannot find it. Perez, therefore, has not met his

14   burden to show that "the rights allegedly violated were clearly established." *Shafer*, 868

15   F.3d at 1118; *see also Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F.

16   Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[I]n most circumstances, failure to respond in an

17   opposition brief to an argument put forward in an opening brief constitutes waiver or

18   abandonment in regard to the uncontested issue."). Summary judgment is **GRANTED** in

19   favor of Miller and Hale on the unlawful seizure claim on the basis of qualified immunity.[9]

20   **2. Excessive Force (Claim 2)**

21       Courts analyze excessive force claims under the Fourth Amendment's "objective

22   reasonableness" standard. *Price v. Sery*, 513 F.3d 962, 967 (9th Cir. 2008) (citing *Graham*

23   *v. Connor*, 490 U.S. 386, 388 (1989)). The reasonableness determination "requires a

24   careful balancing of the nature and quality of the intrusion on the individual's Fourth

25   Amendment interests against the countervailing governmental interests at stake." *Graham*,

26

27       [9] If the MSJ had not been granted as to Koval and Janusz as to the unlawful seizure claim, they too

28   would be entitled to summary judgment based on qualified immunity.

490 U.S. at 396 (internal quotation marks and citation omitted). Because reasonableness is not susceptible to precise definition or mechanical application of rules, the inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

Courts in the Ninth Circuit employ a three-step analysis in evaluating excessive force claims. The first step is to assess the severity of the intrusion on the plaintiff's Fourth Amendment rights based on the type and amount of force inflicted. Next, a court must evaluate the government's interests in light of the three *Graham* factors: (1) the severity of the crime; (2) the threat posed to officers or bystanders; and (3) any resistance to arrest and risk of flight. Finally, a court must balance the gravity of the intrusion on the plaintiff against the government's need for the intrusion. *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018); *see also Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). The Ninth Circuit has held that "[b]ecause the reasonableness standard 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Torres*, 648 F.3d at 1125 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). "This is because such cases almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (*en banc*).

The basis of Perez's excessive force claim is a little difficult to discern from the briefing, but his SAC alleges that (1) Piña used excessive force against him when she entered his home "with substantial force and violence," and (2) that Hale and Janusz used excessive force when handcuffing him before his transport to ARMC. SAC ¶¶ 98–107.

As for Piña, video evidence shows that she did not use excessive force, or any force at all, when entering his home. *See* SUF 6; MSJ, Ex. U (footage of initial entry from Piña's

-16-

body-worn camera) at 00:05–00:15.   His decision to omit this argument from his Opposition seems to concede this point.

Instead, in his Opposition, Perez focuses on the force allegedly used by Janusz and Hale when placing him into handcuffs.  *See* Opp. at 39–40; *see also* SAC ¶¶ 104–07.  It is curious that he makes this argument, because it seems to contradict his Response to Defendants' Undisputed Fact No. 44, in which he does not dispute that neither Hale nor Janusz used force against him in the "subject incident."  SUF 46, 47.  In his declaration, he states that when applying the handcuffs, unspecified Defendants "cinched them down," which caused him to experience "extreme pain and discomfort," and that they refused to loosen them in response to what appears to have been a single request.  Perez Decl. ¶¶ 79–81.  This is the only evidence he presents in support of this argument.  Vague testimony regarding temporary handcuffing pain, without more detailed facts or evidence of demonstrable injury, is not enough to withstand a summary judgment motion.  *See Arias v. Amador*, 61 F. Supp. 3d 960, 976–77 (E.D. Cal. 2014).

Perez cannot hold Hale or Janusz liable for excessive force "without a showing of individual participation in the unlawful conduct."  *See Esteem v. City of Pasadena*, No. CV 04-662-GHK (MANx), 2007 WL 4270360, at *14 (C.D. Cal. Sept. 11, 2007) (citing *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996)); *see also* Reply at 15–18.  His declaration fails to provide any specific facts that could support individual liability for either of them, and therefore has not met his burden to show there is a genuine issue of fact for trial.  *See Celotex Corp.*, 477 U.S. at 324; Fed. R. Civ. P. 56(c).

The Court **GRANTS** summary judgment on Perez's Section 1983 claim for excessive force in favor of Piña, Janusz, and Hale.

### 3.    Search and Seizure of Perez's Property (Claims 3 and 5)

Perez contends that the FPD procured search warrants for his property without a proper showing of probable cause, in violation of his Fourth Amendment rights.  Opp. at 37–39; *see* SUF 17.

-17-

Probable cause to support the issuance of a search warrant exists if given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *People v. Evans*, 200 Cal. App. 4th 735, 753 (2011) (citing *Alabama v. White*, 496 U.S. 325, 330 (1990) (quotation marks omitted)). A fair probability does not mean "certainty or even a preponderance of the evidence." *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (citing *Gates*, 462 U.S. at 246). Probable cause to search therefore exists when the "known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Evans*, 200 Cal. App. 4th at 753 (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). It is a "fluid concept—turning on the assessment of probabilities in particular factual contexts," and is incapable of precise definition, but must be based on "objective facts" rather than the officer's state of mind. 200 Cal. App. 4th at 753 (quotation marks and citations omitted); *see also Gates*, 462 U.S. at 232. Thus, this Court must look to the judge's determination based on the "commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Gates*, 462 U.S. at 230.

Courts usually review the issuance of a search warrant deferentially, and uphold it if the issuing judge "had a substantial basis for concluding that probable cause existed based on the totality of the circumstances." *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (internal quotation, brackets, and citations omitted). But the Fourth Amendment standard on probable cause assumes that there is a *truthful* factual showing to support probable cause. *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978). If an affiant knowingly or recklessly provides false information in the affidavit, the warrant is invalid and there may be a cognizable Fourth Amendment violation despite the facially valid warrant. *Id.* at 171–72.

To prevail on such a claim in the section 1983 context, plaintiffs do not need to establish that the investigating officer had specific intent to deceive the issuing judge.  *See Lombardi v. City of El Cajon*, 117 F.3d 1117, 1124 (9th Cir. 1997).  Rather, the plaintiff must (1) establish that the warrant affidavit contained misrepresentations or omissions material to the finding of probable cause, and (2) make a "substantial showing" that the misrepresentations or omissions were made intentionally or with reckless disregard for the truth.  *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011); *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004); *Galbraith v. City of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002).  The first assessment, that of materiality of the misrepresentations or omissions, is a question that must be decided by the court, rather than a jury.  *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995).

Perez argues that the warrants in this case were "deficient" because they overly relied on a "conclusory, generalized" anonymous tip that Perez was abusing his father, and that the blood evidence did not adequately support probable cause.  Opp. at 38–39.[10]  There are three separate warrants at issue, dated August 8, 9, and 13.  SUF 17, 48; Aug. 13 Warrant at 2–15.  Perez does not present any caselaw in support of either his arguments on this point, but essentially quibbles with the level of detail in the affidavit, including a passing reference to neighbors telling FPD officers they believe that Perez abuses his father, Aug. 8 Warrant at 142; Aug. 9 Warrant at 157; Aug. 13 Warrant at 8, and a reference to the "presence of blood located in the hallway next to Thomas Perez, Sr.'s bedroom, stairwell, and garage" in the August 9 and August 13 Warrants.

The issue of materiality is a question for the Court, *see Hervey*, 65 F.3d at 789, and the Court concludes that the alleged omissions in these two statements are not material to the finding of probable cause.  All three affidavits set forth many facts—including the disarray in his home, the missing mattress in Perez Sr.'s bedroom, the inconsistency of

---

[10] Perez's Opposition also states that Defendants' investigation into Perez "failed," with only general citations to Exhibits 4, 5, 6, and 10 to the Culp Declaration.  Opp. at 38.

Perez's statements, and the account of Perez suspiciously backing his truck into his garage at a very early hour—that the judges relied on to find probable cause. *See* Aug. 8 Warrant at 142; Aug. 9 Warrant at 157; Aug. 13 Warrant at 8; *see also Ewing*, 588 F.3d at 1226 ("The omission of facts rises to the level of misrepresentation only if the omitted facts case doubt on the existence of probable cause."). Additional details about the neighbors' reference to elder abuse would not have made a difference. In the latter two warrants, it is even less plausible that the amount of blood was material to the judges' finding because the affidavit also relies on all the other information collected from the FPD's initial search. *See* Aug. 9 Warrant at 157; Aug. 13 Warrant at 8.

Even if Perez's expert, Jeff Noble, disagrees with the judges' findings, he does not offer any explanation of a single material misrepresentation or omission that would have been likely to change the judges' conclusion. *See* Opp. at 39; *see also* Decl. of Jeff Noble ISO Pl.'s Opp., Ex. A (Noble's Rule 26 Report) at 24–30 [Doc. # 72].

Since Perez fails to support his arguments of judicial deception with any caselaw or evidence, the Court **GRANTS** summary judgment on Perez's claim for unreasonable search and seizure of his property.

### 4.    First Amendment (Claim 6)

To succeed on a claim for retaliation in violation of the First Amendment against Defendants, Perez must prove that (1) they "took action that 'would chill or silence a person of ordinary firmness from future First Amendment activities'" and (2) his "desire to cause the chilling effect was a but-for cause" of this action. *Skoog v. County of Clackamas*, 469 F.3d 1221, 1231–32 (9th Cir. 2006) (quoting *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)).

Perez does not specify which aspects of which Defendants' conduct allegedly violated the First Amendment, nor does he cite any evidence that the conduct would "chill or silence a person of ordinary firmness" from such activities or of "but-for" causation. *See* Opp. at 40–41. Furthermore, the existence of probable cause is usually fatal to a First Amendment retaliation claim. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1723 (2019).

Accordingly, Defendants' MSJ is **GRANTED** on the First Amendment claim.  *See Celotex Corp.*, 477 U.S. at 324.

### 5.      Fourteenth Amendment (Claim 7)

#### a.      Due Process Violation

An individual subjected to coercive interrogation techniques can bring a substantive due process claim under Section 1983 for violation of the Fourteenth Amendment.  *Tobias v. Arteaga*, 996 F.3d 571, 584 (9th Cir. 2021); *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 431–32 (9th Cir. 2010); *Stoot v. City of Everett*, 582 F.3d 910, 928 (9th Cir. 2009); *see also Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (plurality opinion).  The substantive due process standard requires Perez to show that Defendants engaged in an "abuse of power [that] 'shocks the conscience' and 'violates the decencies of civilized conduct.'" *Stoot*, 582 F.3d at 928 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  Claims of "police torture or other abuse" can be cognizable under the Fourteenth Amendment, and "need not include physical violence to violate substantive due process." *Chavez*, 538 U.S. at 773–74; *Crowe*, 608 F.3d at 431.  Indeed, courts have recognized that "*psychological coercion is sufficient.*"  *Stoot*, 582 F.3d at 929 (emphasis in original).  The Supreme Court has emphasized that the context of any official conduct must be considered in determining whether conduct shocks the conscience, and "conduct *intended* to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849–53 (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986)).  Courts also consider the suspect's personal characteristics, such as mental condition, in assessing whether a confession was coerced in violation of the Due Process Clause.  *See United States v. Preston*, 751 F.3d 1008, 1018–19 (9th Cir. 2014) (*en banc*) (analyzing voluntariness of confession in criminal context).

Viewing the evidence in the light most favorable to Perez, a reasonable juror could conclude that Hale and Janusz inflicted unconstitutional psychological torture on Perez.  *See* Opp. at 32–37.  First of all, Perez was questioned for 17 hours, even after he was in visible distress.  *Cf. Crowe*, 608 F.3d at 418–23 (six-hour interrogation held

unconstitutional); *see also Tobias*, 996 F.3d at 586 (discussing how "hours and hours" of coercive questioning often "shock the conscience").   The Interrogation Room Video contains hours of footage during which Perez is upset and crying, while Hale and Janusz accuse him of murder, press him to confess, and even imply that his dog might need to be put down as a consequence of his actions. *See, e.g.*, Interrogation Room Video at 3:30:25–3:31:54 ("It did happen . . . you killed him, and he's dead. . . . You know you killed him, you did. . . .  You're not being honest with yourself.  How can you sit there, how can you sit there and say you don't know what happened, and your dog is sitting there looking at you, knowing that you killed your dad?  Look at your dog.  She knows, because she was walking through all the blood.").   At one point while they are telling him to confess, he starts pulling at his own hair, hitting himself, making anguished noises, tears off his own shirt, and nearly falls to the floor. *Id.* at 3:44:30– 3:46:25.  During this episode, the officers laugh at him and tell him that he is stressing out his dog. *Id.* at 3:45:25–30.  Later, they tell him that they are going to give away his dog. *Id.* at 4:23:52–24:27.  Hale and Janusz's conduct impacted Perez so greatly that he falsely confessed to murdering his father and attempted to commit suicide in the station.  SUF 33, 34; Interrogation Room Video at 5:59:51–6:02:40.  He testified that the officers prevented him from sleeping and deprived him of his medication. *See* Perez Decl. ¶¶ 35, 40–44; *see also, e.g.*, MSJ, Exs. ZZ (Guthrie BWC footage) at 00:07–43 (refusing to provide medical care to Perez), GGG (same) at 00:36–46 (same).  There is no legitimate government interest that would justify treating Perez in this manner while he was in medical distress, since the FPD already had two warrants to search his person and property, and he was already essentially in custody and unable to flee or tamper with any evidence. *Cf. Chavez*, 538 U.S. at 774–75.

**b.   Qualified Immunity**

Courts have found that qualified immunity does not apply in coercive interrogation cases, particularly those involving prolonged questioning of a vulnerable individual. *See Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003); *Crowe*, 608 F.3d at 432.

-22-

An early Ninth Circuit case discussing Section 1983 liability on a substantive due process theory for a coercive interrogation, *Cooper v. Dupnik*, affirmed a denial of defendants' motion for summary judgment when officers interrogated an adult suspect who was in serious pain, "evidently confused and unable to think clearly," and "weakened by pain and shock." 963 F.2d 1220, 1247–48 (9th Cir. 1992) (*en banc*), *overruled on other grounds by Chavez*, 538 U.S. at 772–73.

In *Crowe*, relying on *Cooper*'s substantive due process holding, the Ninth Circuit held that the officers were not entitled to qualified immunity after the suspects "were isolated and subjected to hours and hours of interrogation during which they were cajoled, threatened, lied to, and relentlessly pressured by teams of police officers." 608 F.3d at 432 (citing *Cooper*, 963 F.2d at 1223). This description applies equally to the facts of this case. *See* Opp. at 42–47.

Defendants distinguish *Crowe* because it involved children, not adults like Perez. *See* Reply at 21 n.10. But *Crowe* does not limit its holding to children, and the analysis highlights two other aspects of the interrogation as reasons that the interrogations were even more "shocking" than the facts of *Cooper*: its length, and one plaintiff's compromised state of mind after witnessing his mother's death. *Crowe*, 608 F.3d at 432. These three factors, taken together, constitute the list of reasons that *Crowe* finds the interrogation "shocks the conscience," even "more so" than the facts of *Cooper*. *Id.* Even though *Crowe* is the first published Ninth Circuit decision addressing the interrogation of minors in a substantive due process claim, the court denies qualified immunity, pointing to the holding of *Cooper* in addition to *dicta* in a Fifth Amendment case stating that children must be questioned with "the greatest care." *Id.* (citing *In re Gault*, 387 U.S. 1, 55 (1967)). The importance of this holistic analysis is affirmed in *Tobias*, an opinion issued after the events of this case but still instructive on the correct analytical approach to a substantive due process claim. In *Tobias*, the court heavily relied on *Crowe* and conducted a thorough analysis of the conditions of interrogation, relying on more than just the plaintiff's age. *Tobias*, 996 F.3d at 584–86.

Similar to the recognition that the government must exercise heightened care in the treatment of minors, there is a "clearly established" legal principle that mental state— especially mental disability—must be considering in evaluating the propriety of a police officer's conduct towards that individual. *See, e.g., Rodriguez v. McDonald*, 872 F.3d 908, 923 (9th Cir. 2017) ("Like youth, 'mental condition is surely relevant to an individual's susceptibility to police coercion.'" (quoting *Colorado v. Connelly*, 479 U.S. 157, 165 (1986)); *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (*en banc*) (in evaluating voluntariness of confessions, the court "takes into consideration the totality of all the surrounding circumstances—*both* the characteristics of the accused *and* the details of the interrogation." (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)).

Here, Perez's mental state, among other factors, made him a vulnerable individual. He was sleep deprived, mentally ill, and, significantly, undergoing symptoms of withdrawal from his psychiatric medications. Perez Decl. ¶¶ 31–42; Opp. at 18–19. He was berated, worn down, and pressured into a false confession after 17 hours of questioning. Hale and Janusz did this with full awareness of his compromised mental and physical state and need for his medications. Perez Decl. ¶ 55; *see also* Interrogation Room Video at 6:34:18–26 (telling Perez that medication would not help after discussing his symptoms of mental illness); 5150 Report at 3 (stating that Perez told them "he suffered from depression and had other mental disorders"); *cf. Preston*, 751 F.3d at 1016 (while compromised mental state "does not categorically make a confession involuntary," it is "relevant in establishing a setting in which police coercion may overcome the will of a suspect.") (internal quotation, ellipses, and citation omitted).

Indeed, this case shares numerous "particularized" facts with *Crowe*. *See White*, 580 U.S. at 79. The common facts include: officers intentionally wearing Perez down with prolonged questioning, threatening him, lying to him, and relentlessly pressuring him. *See Crowe*, 608 F.3d at 432; Perez Decl. ¶¶ 55 (refusing to provide medical attention when he informed them he felt unwell), 63 (suggesting that his dog would have to be euthanized), 68 (he would be "charged" $1 million in restitution if he did not disclose the location of

his father's body).  In *Crowe*, the court also pointed to the fact that one of the plaintiffs was in a compromised mental state due to the shock of losing a loved one, as Perez believed had happened here (his father, and potentially his dog as well).  *Id.*  Indeed, the 17 hours that Perez was at the FPD station in this case far surpasses the length of the unconstitutional interrogation sessions in *Crowe*, which the Court found to be the most important factor for determining that qualified immunity existed in *Tobias*.  *See Tobias*, 996 F.3d at 585 (two hours); *Crowe*, 608 F.3d at 432 (six hours).

As noted above, there are triable issues of fact regarding whether Perez's interrogation amounted to "psychological torture."  Perez's substantive due process right against psychological torture of this nature was "clearly established" at the time of the incident, to a degree that "every reasonable officer would have understood that what he was doing violates that right."  *See Cates v. Stroud*, 976 F.3d 972, 978 (9th Cir. 2020) (quoting *Taylor v. Barkes*, 575 U.S. 822 (2015)); *see also Jessop v. City of Fresno*, 936 F.3d 937, 940–41 (9th Cir. 2019) (*en banc*) (same).  Therefore, Hale and Janusz are not entitled to qualified immunity on this claim.

For the foregoing reasons, the Court **DENIES** Hale and Janusz's MSJ on this claim and, since there is no evidence implicating Miller, Piña, and Koval, **GRANTS** summary judgment to the latter Defendants on the Fourteenth Amendment claim.

## B.    State Claims

### 1.    False Arrest/Imprisonment

"The elements of a tortious claim of false imprisonment are:  (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief."  *Lyons v. Fire Ins. Exchange,* 161 Cal. App. 4th 880, 888 (2008) (quotation omitted).

The Court granted summary judgment on Perez's Fourth Amendment claim for unlawful seizure, based in part on Hale and Miller's qualified immunity defense, which does not apply to false arrest claims under California law.  *See Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 788 (2017), *as modified* (Nov. 17, 2017).

For the reasons discussed above regarding Perez's claim for unlawful seizure of his person, *see supra* Section IV.A.1.a, the Court **DENIES** summary judgment on his false imprisonment claim as to Hale and Miller for their pre-August 8 warrant conduct, but **GRANTS** it as to Piña, Koval, and Janusz.

### 2.     Battery

Perez's battery claim under California law involves the same standards as that of an excessive use of force claim under the Fourth Amendment.  *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009) ("A state law battery claim is a counterpart to a federal claim of excessive use of force."); *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010), *aff'd*, 685 F.3d 867 (9th Cir. 2012) ("[T]he same standards apply to both state law assault and battery and section 1983 claims premised on constitutionally prohibited excessive force . . . .").  Since his excessive force claim fails as a matter of law, his battery claim also fails.  The Court **GRANTS** summary judgment on this claim.

### 3.     Intentional Infliction of Emotional Distress

To make out a claim for IIED, Perez must show "(1) extreme and outrageous conduct by [Defendants] with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant[s'] outrageous conduct."  *Ess v. Eskaton Properties, Inc.*, 97 Cal. App. 4th 240, 129 (2002) (quoting *Cervantez v. J.C. Penney Co.*, 24 Cal. 3d 579, 593 (1979)).  "An essential element of such a claim is a pleading of outrageous conduct beyond the bounds of human decency."  *Janken v. GM Hughes Electronics*, 46 Cal. App. 4th 55, 80 (1996).

For the same reasons discussed above regarding his substantive due process claim, *see supra* Section IV.A.5, the Court concludes there is a triable issue of fact that remains as to whether Defendants Hale and Janusz could be liable for IIED based on their conduct during their interrogation of Perez.  *See* Opp. at 50–52.  The Court **DENIES** summary judgment as to those two Defendants, and **GRANTS** it as to Miller, Piña, and Koval.

### 4.   Bane Act

California Civil Code section 52.1, known as the Bane Act, creates a cause of action against those who interfere with constitutional or statutory rights "by threat, intimidation, or coercion." Cal. Civ. Code § 52.1. Where Perez's other constitutional and statutory claims have failed, his Bane Act claims also necessarily fail.

The Court has concluded that there are triable issues of fact as to two constitutional violations: the lawfulness of Perez's seizure before the August 8 Warrant (by Hale and Miller), and whether his interrogation constituted "psychological torture" (by Hale and Janusz).[11] *See supra* Parts IV.A.1.a, 5.a.

As for the Fourth Amendment and false imprisonment claims, neither side identifies any specific evidence supporting a finding that Hale and Miller's potentially unconstitutional seizure of Perez was done "by threat, intimidation, or coercion" and thus summary judgment is appropriate. *See* MSJ at 30; Opp. at 50. As for the substantive due process claim, the facts leading to a triable issue of fact also necessarily support a triable issue of fact on the Bane Act claim, since the underlying potentially unlawful interrogative conduct includes threat, intimidation, and coercion.

The Court therefore **GRANTS** summary judgment on Perez's Bane Act claims relating to the search and seizure of his person and property, excessive force, retaliation, and false imprisonment claims. The Court **DENIES** summary judgment as to his Bane Act claims against Hale and Janusz relating to his substantive due process claim.

## V.
## CONCLUSION

For the foregoing reasons, the Court orders the following:

---

[11] The Court's finding of qualified immunity on the Fourth Amendment claim does not affect the viability of a Bane Act claim predicated on the same violation. *See Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040–41 (9th Cir. 2018).

-27-

a.   Summary judgment is **GRANTED** to all Defendants on Perez's claims for search and seizure of his person and property, excessive force, retaliation, battery, and the corresponding Bane Act claims;

b.   Summary judgment is **DENIED** as to Hale and Janusz and **GRANTED** as to Miller, Piña, and Koval on Perez's substantive due process and IIED claims, and the corresponding Bane Act claims; and

c.   Summary judgment is **DENIED** as to Hale and Miller and **GRANTED** as to Piña, Koval, and Janusz on Perez's false imprisonment claim, and the corresponding Bane Act claims.

Accordingly, the claims remaining for trial are the following:

a.   Section 1983 claim for substantive due process violation against Hale and Janusz;

b.   IIED claim against Hale and Janusz;

b.   Bane Act claim based on substantive due process violation against Hale and Janusz; and

c.   False imprisonment claim, and its corresponding Bane Act claim, against Hale and Miller.

**IT IS SO ORDERED.**

DATED:  June 15, 2023

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

-28-